**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re:<br><br>ARD FINANCE, S.A.,<br><br>Debtor in a Foreign Proceeding. | **FOR PUBLICATION**<br><br>Case No. 25-12794 (MG)<br><br>Chapter 15 |

**MEMORANDUM OPINION AND ORDER RECOGNIZING FOREIGN
MAIN PROCEEDING**

*A P P E A R A N C E S:*

GLENN AGRE BERGMAN & FUENTES LLP
*Attorneys for Foreign Representative*
1185 Avenue of the Americas, 22nd Floor
New York, New York 10036
By:    Andrew K. Glenn, Esq.
        Jonathan H. Friedman, Esq.
        Naznen Rahman, Esq.

WHITE & CASE LLP
*Attorneys for PIK Ad Hoc Group*
1221 Avenue of the Americas
New York, New York 10020
By:    J. Christopher Shore, Esq.
        Harrison Denman, Esq.
        Erin Smith, Esq.
        Andrew Costello, Esq.

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

This Opinion addresses a contested motion for recognition as a foreign main

proceeding of a proceeding pending in the Luxemburg District Court.  The Ad Hoc

Group of PIK Noteholders (the "PIK AHG") filed an objection to the motion.  For the

reasons stated in this Opinion, the proposed foreign representative is recognized as the

Foreign Representative and the Luxemburg Proceeding is recognized as a Foreign Main

1

Proceeding.[1] No plan has yet been approved by the Luxemburg District Court. Assuming that a plan is approved by that court, the Foreign Representative will have to come back to this Court with a new motion if it seeks enforcement of such a plan within the territorial jurisdiction of the United States. Most of the issues raised by the PIK AHG in its objection at the recognition stage are premature and can be raised again at the enforcement stage.

## I. BACKGROUND

### A. Petition for Recognition

The Foreign Representative filed a Petition for Recognition of the Foreign Main Proceeding as the foreign main proceeding (ECF Doc. # 1), and related *Motion for (I) Recognition of the Foreign Main Proceeding, (II) Recognition of the Foreign Representative, and (III) Certain Related Relief* (the "Recognition Motion," ECF Doc. # 2). The Foreign Representative also filed a *Motion for Entry of an order (I) Scheduling Recognition Hearing, (II) Specifying Form and Manner of Service of Notice, and (III) Granting Related Relief* (ECF Doc. # 5), as well as three declarations. The first declaration is the *Declaration of Torsten Schoen in Support of the Motion for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Certain Related Relief* (the "Schoen Declaration," ECF Doc. # 3), the second is the *Declaration of Michel Nickels in Support of the Motion for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Certain Related*

---

[1] Initially, the proposed foreign representative also sought provisional relief pursuant to 11 U.S.C. § 1519 to enjoin an action filed by the ARD PIK AHG in New York Supreme Court. Before that motion was heard by this Court the parties agreed to voluntarily stay the state court action until this Court decides the recognition motion. In light of this Order recognizing the Foreign Main Proceeding, the motion for provisional relief is now moot, since upon recognition the state court action is now stayed pursuant to section 1520 (a)(1) of the Code and will not be further addressed in this Opinion.

*Relief* (the "Nickels Declaration, ECF Doc. # 4), and third, the *Supplemental Declaration*

*of Michel Nickels in Further Support of the Motion for (I) Recognition of Foreign Main*

*Proceeding, (II) Recognition of Foreign Representative, and (III) Certain Related Relief*

(the "Supplemental Nickels Declaration," ECF Doc. # 28).

Additionally, the PIK AHG filed the *Objection to the Recognition Motion* (the

"Objection," ECF Doc. # 24) and the *Declaration of Erin Smith in Support of the Ad Hoc*

*Group's Objection to the Recognition Motion* (the "Smith Declaration," ECF Doc. # 25).

### B.  General Background

Torsten Schoen is the Chief Legal Officer and Company Secretary of the Debtor

and is a German-trained lawyer.  He is also the proposed Foreign Representative for the

Debtor.  He submits that the Debtor is a holding company constituted in the form of a

Luxembourg *société anonyme*, incorporated by notarial deed dated May 6, 2011, and

registered with the Luxembourg register of Commerce and Companies (*Registre de*

*Commerce et des Sociétés*) under number B 160806.  (Schoen Decl. ¶ 6.)  The Debtor

was incorporated pursuant to Luxembourg law, and its registered office is located at 56,

rue Charles Martel, L-2134 Luxembourg.  (*Id.*)

3

The Debtor's corporate structure is as follows



(Petition, Ex. 3.)

The Debtor's board is comprised of two directors, Manuel Baldauff and Johannes de Zwart, both of whom are located in Luxembourg. (Schoen Decl. ¶ 7.) All board meetings have been conducted in Luxembourg since the Debtor's incorporation. (*Id.*) The Debtor has a bank account located in Luxembourg and its books and records are maintained at its offices in Luxembourg. (*Id.*) Prior to the Petition Date, the Debtor paid a retainer to its U.S. restructuring counsel, Glenn Agre Bergman & Fuentes LLP. (*Id.*) The Debtor purports to have an interest in such funds, which are held in a client trust account in New York. (*Id.*)

The Debtor has historically served as a holding and financing entity within the Ardagh Group, a global supplier of metal and glass packaging. (*Id.* ¶ 8.) The Debtor's

4

corporate purpose includes the acquisition of Luxembourg and foreign companies, the issuance of debt instruments, and providing financing within the Ardagh Group.  (*Id.*)

Before the commencement of the judicial reorganization by collective agreement proceeding (*procédure de réorganisation judiciaire par accord collectif*) (the "Luxembourg Proceeding"), the Debtor held 80.53% of the issued share capital of Ardagh Group S.A., a Luxembourg *société anonyme* established and having its registered office at L-2134 Luxembourg (Luxembourg), 56, rue Charles Martel, registered with the Luxembourg register of Commerce and Companies (*Registre de Commerce et des Sociétés*) under number B160804 ("AGSA").  (*Id.* ¶ 9.)  The Debtor also held 100% of the issued share capital of ARD Group Finance Holdings S.A., a Luxembourg *société anonyme*, established and having its registered office at the same address, registered with the Luxembourg register of Commerce and Companies (*Registre de Commerce et des Sociétés*) under number B209270 ("AGFH").  (*Id.*)  AGFH held the remaining 19.47% of the shares in AGSA.  (*Id.*)

### C.  The Debtor's Existing Indebtedness and the PIK Notes

In 2019, the Debtor issued two series of senior secured toggle notes: (i) €1 billion of Euro-Denominated 5.000% / 5.750% Senior Secured Toggle Notes due 2027 (the "EUR Toggle Notes"), and (ii) $895 million of Dollar-Denominated 6.500% / 7.250% Senior Secured Toggle Notes due 2027 (the "USD Toggle Notes" and, together with the EUR Toggle Notes, the "PIK Notes").  (*Id.* ¶ 10.)  The PIK Notes were issued pursuant to an Indenture, dated as of November 20, 2019, by and among the Debtor, as Issuer, Citibank N.A., London Branch, as Trustee, Principal Paying Agent, Transfer Agent and Security Agent, and Citigroup Global Markets Europe AG, as Registrar (the "PIK

5

Indenture"). (*Id.*)  The PIK Indenture is governed by New York law and contains a New York forum-selection clause. (*Id.*)  The PIK Notes have a maturity date of June 30, 2027.[2] (*Id.*)

In January 2022, the Debtor proceeded to a partial redemption of (i) €204.1 million of the EUR Toggle Notes and (ii) $234.7 million of the USD Toggle Notes. (*Id.* ¶ 11.)  The Debtor has approximately €860 million and $986 million in outstanding indebtedness pursuant to the PIK Indenture. (*Id.*)

The Debtor's obligations arising under the PIK Notes were secured by two (2) share pledge agreements collectively covering the pledge of 100% of the shares in AGSA (the "Share Pledges"). (*Id.* ¶ 12.)  Pursuant to a Share Pledge Agreement, dated November 21, 2019, between the Debtor, as pledgor, and Citibank, N.A., London Branch, as pledgee (the "AGFH Pledge Agreement"), the Debtor pledged 100% of issued shares of AGFH. (*Id.*)  Pursuant to a separate Share Pledge Agreement, dated November 21, 2019, between the Debtor and AGFH, as pledgors, and Citibank, N.A., London Branch, as pledgee (together with the AGFH Pledge Agreement, the "Pledge Agreements"), the Debtor and AGFH pledged 100% of the issued shares in AGSA.[3] (*Id.*)

**D.  The Luxembourg Proceeding and the Debtor's Proposed Restructuring**

AGSA announced that it would undergo a recapitalization transaction (the "Recapitalization Transaction" or the "Transaction") to address the Ardagh Group's financial distress in the summer of 2025. (*Id.* ¶ 13.)  The Foreign Representative submits that the Ardagh Group's total indebtedness under the senior notes and the PIK Notes, as of June 30, 2025, stood at approximately $4.3 billion, a level that could not be repaid by

---

[2]     A copy of the PIK Indenture is annexed to the Schoen Declaration as <u>Exhibit A</u>.
[3]     Copies of the Pledge Agreements are annexed to the Schoen Declaration as <u>Exhibit B</u>.

ARDF. (*Id.*) The Recapitalization Transaction was intended to deleverage AGSA and its subsidiaries through a debt-for-equity exchange of those obligations and contemplated an infusion of approximately $1.5 billion in new capital. (*Id.*) In the fourth quarter of 2025, AGSA filed an application in the Luxembourg District Court for judicial approval of an agreement with certain of its creditors (*requête en homologation*) in order to implement the proposed restructuring in a court-supervised process. (*Id.*)

The Debtor then filed an application to open the Luxembourg Proceeding under Articles 12 and 13 of the of the Luxembourg law of August 7, 2023 on the preservation of businesses and the modernization of bankruptcy law, with the Luxembourg District Court on November 12, 2025, in order to restructure its liabilities under the PIK Notes and restore its financial viability. (*Id.* ¶ 14.)

The Luxemburg District Court conducted a hearing on November 26, 2025, and issued a corresponding judgment opening the Luxembourg Proceeding (the "Judgment") on December 3, 2025. (*Id.* ¶ 15.) Schoen submits that the Debtor's directors play an active role in monitoring and coordinating the Debtor's affairs during the Luxembourg Proceeding. (*Id.*) The reorganization plan proposed by the Debtor provides for the following:

- a debt-to-equity conversion of the PIK Notes, which would reduce the Debtor's outstanding indebtedness under the PIK Notes to zero in exchange for the holders of the PIK Notes (the "PIK Noteholders") receiving shares of the Debtor;

- the agreement of ARD Securities Finance Sarl, the direct parent of the Debtor, to support, approve, implement, and use commercially reasonable efforts to take all reasonably necessary actions to facilitate the consummation of the transactions

contemplated by the reorganization plan, including transferring all its shares held in the Debtor upon court approval of the plan (in consideration for certain releases and cost coverage in respect of its solvent liquidation) to allow the PIK Noteholders to receive their allocation of shares of the Debtor; and

- the PIK Noteholders becoming shareholders of the reorganized Debtor.

(*Id.* ¶ 17.)

EquityCo (defined below) agreed to transfer certain equity interests in EquityCo to the Debtor for nominal value (the "EquityCo Proposal"), which would provide former PIK Noteholders an indirect economic interest (as future shareholders of the reorganized Debtor) in the Ardagh Group. (*Id.* ¶ 18.) The EquityCo Proposal is conditioned upon approval of the reorganization plan by the Debtor's creditors as well as the Luxembourg District Court. (*Id.*) The Foreign Representative claims that the Debtor expects approval of the plan by a majority in number and value, given that the PIK Noteholders constitute the Debtor's only substantial creditors. (*Id.*)

### E.  The Pending New York Action

Certain minority holders of the Debtor's PIK Notes – Carronade Capital master, LP, Crown Managed Accounts SPC, and Deutsche Bank Securities Inc. (together, the "PIK Plaintiffs"), commenced an action against the Debtor in the Supreme Court of the State of New York, County of New York, captioned *Carronade Capital Master, LP et al. v. ARD Finance S.A.*, Index No. 659752/2025 (the "New York Action"). (*Id.* ¶ 19.) The PIK Plaintiffs began the New York Action by moving for summary judgment in lieu of complaint under CPLR 3213, claiming that an event of default occurred under the PIK Indenture and sought payment of approximately $250 million in alleged accelerated

8

unpaid principal, plus interest and fees. (*Id.*) The Foreign Representative notes that the Debtor had not yet responded to the motion for summary judgment, but its response was due on December 15, 2025. (*Id.*) The Debtor requested provisional relief in order to avoid diverting its limited resources to defend itself at the outset of the Luxembourg Proceeding. (*Id.*) The Debtor claims that the initial relief is necessary in order to preserve the orderly administration of the Luxembourg Proceeding and prevent the unnecessary depletion of estate resources and increase of administrative costs. (*Id.*)

By agreement of counsel, the New York Action was stayed. As already stated, *see* n. 1, *supra*, the request for provisional relief is now moot.

On December 17, 2025, the PIK AHG served discovery requests on the Foreign Representative seeking the Recapitalization Transaction and its implementation, the Luxembourg Proceeding, the filing of the Chapter 15 Petition, the New York Action, the valuation of the Debtor, the Ardagh Group or any of the operating subsidiaries, and other COMI-related information relevant to the Recognition Motion. (Objection ¶ 34.) Then on December 18, 2025, the Debtor served discovery requests on the PIK AHG seeking information regarding its holdings and documents and communications on which the PIK AHG would rely on in support of its Objection or would seek to introduce at hearing on the Motion. (*Id.*)

On December 22, 2025, the parties exchanged responses and objections to each party's discovery requests. (*Id.* ¶ 35.) Additionally, the PIK AHG made an initial production consistent with its responses and objections on December 31, 2025. (*Id.*) The PIK AHG claims that the Debtor took the position that it would produce limited discovery pertaining to the Luxembourg Proceeding; and claimed that the Luxembourg

Proceeding was limited in scope and would not adjudicate transactions involving other Ardagh entities or the Global Restructuring. (*Id.*) The Debtor also declined to produce documents related to the Global Restructuring claiming it is not relevant to the Recognition Motion and is outside the scope of permissible discovery. [4] (*Id.*)

### F. The PIK AHG Claims the Parent Equity Seeks to Retain Control of the Overleveraged Ardagh Group

The Ardagh Group's typical business practices involved the issuance of tranches debt, from which the proceeds would go towards the payment of existing debt to operations. (*Id.* ¶ 11.) Through the Debtor's subsidiaries, Ardagh Packaging Finance PLC and Ardagh Holdings USA Inc. (together, the "Co-Issuers"), the Ardagh Group had issued a series of senior secured notes (the "SSNs") and senior unsecured notes (the "SUNs"). (*Id.*)

The PIK AHG claims that the Ardagh Group began to struggle to handle its debt, and turned its focus to preserving the equity economic and governance rights of Mr. Paul Coulson (the "Shareholder" or "Coulson") and his investment vehicle, Yeoman Capital S.A. ("EquityCo" and together with Coulson, the "Existing Equity") and engaged in financial over-engineering. (*Id.* ¶ 12.) For example, the PIK AHG claims that the Ardagh Group entered into a credit facility comprising an initial €790 million senior secured term loan, a $250 million senior secured exchange term loan, and additional senior secured term loans secured by all material assets of Ardagh Investments Holdings Sarl, which effectively subordinated the Group's existing secured and unsecured debt

---

[4] At a discovery conference, the Court granted in part and denied in part the PIK AHG request for discovery from the Foreign Debtor.

including the Secured PIK Notes, without a sustainable solution to the company's leverage. (*Id.*)

On January 7, 2025, the Ardagh Group announced the appointment of two independent directors who specialized in financial restructuring. (*Id.* ¶ 13.) The PIK AHG claims that the Ardagh Group obstructed equity holders through a variety of means, including a requirement that equity holders maintain an 80% ownership stake in the Ardagh Group—a position it maintained throughout a series of negotiations with the SSNs and SUNs. (*Id.* ¶ 14.)

The ad hoc group of SUNs (the "SUN AHG") originally included certain holders of Secured PIK Notes, but after multiple rounds of negotiations, consisted only of (i) holders of SUNs and (ii) holders of SUNs and Secured PIK Notes (collectively, along with holders of the SSNs, the "Cross-Holders"). (*Id.* ¶ 15.) Despite the negotiations, the Cross-Holders were unable to obtain sufficient cooperation from Coulson in facilitating a change of control of Ardagh Group. (*Id.* ¶ 16.) Certain Cross-Holders filed a complaint against the Ardagh Group in New York state court, alleging that the Ardagh Group had a long and ongoing history of siphoning value from its creditors.[5] (*Id.*) Following the filing of the action in New York state court, the Ardagh Group terminated negotiations with the Cross-Holders and Coulsen demanded a $300 million consent payment to engage in further negotiations to relinquish his ownership. (*Id.*)

On July 28, 2025, the Cross-Holders, Coulson, and the Ardagh Group reached an agreement on restructuring terms. (*Id.* ¶ 17.) This agreement was reached without the consent or involvement of the Debtor or the holders of Secured PIK Holders who were

---

[5]   *Arini Credit Master Fund Ltd. et al. v. Ardagh Group S.A. et al.*, No. 651306/2025 (Sup. Ct. 2025).

not Cross-Holders. (*Id.*) The agreement, also called the Recapitalization Transaction, was memorialized in a TSA and provided for a $300 million payment (the "Coulson Payment"), and contemplated awarding take back paper to the secured debt and substantially all the new equity to the Cross-Holders. (*Id.*) The TSA also proposed to leak $300 million to Existing equity but allocated only 7.5% of the new equity to holders of the Secured PIK Notes. (*Id.*) The Cross-Holders were satisfied with this treatment despite the fact that it awarded de minimis value to structurally senior secured creditors because the TSA awarded the Cross-Holders outsized economic treatment of their SUNs. (*Id.*)

Furthermore, eliminating the Secured PIK Notes in exchange for their share of new equity would require at least 90% of the PIK Noteholders, but the Cross-Holders who negotiated the TSA owned only approximately 80% of the Secured PIK Notes. (*Id.* ¶ 18.) Holders of Secured PIK Notes who did not have access to the outsized recovery offered to the SUNs were excluded from negotiations and did not have an incentive to forgive their holdings. (*Id.*)

Yet, the TSA contemplated the consent solicitation by the Debtor to reach the 90% threshold. (*Id.* ¶ 19.) In the event the Debtor was unable to obtain the necessary consent, the TSA contemplated an English scheme of arrangement to bind non-consenting creditors, but without the Debtor's support. (*Id.*)

### G. PIK Noteholder's Attempt at Dialogue

The PIK AHG then details its communication with the Debtor and other parties. On August 7, 2025, the PIK AHG sent a letter requesting clarification of the Debtors

12

position on the Recapitalization Transaction. (*Id.* ¶ 20.) After not receiving a response, the PIK AHG sent a second letter on August 13, 2025. (*Id.*)

The Debtor responded on August 19, 2025, claiming it did not have the means to identify the members of the PIK AHG and condition further collaboration with the PIK AHG on confirmation on the date, purchase price, and amount of the PIK AHG's holdings and requested an explanation as to why they had just identified themselves to the company. (*Id.* ¶ 21.) The PIK AHG then sent a letter to the U.S. and Luxembourgish legal counsel of the Debtor requesting confirmation of the Debtor's position regarding the Recapitalization Transaction and sought to deliver an alternative proposal (the "Alternative Proposal"). (*Id.* ¶ 22.) The Debtor rejected the PIK AHG's proposal and the PIK AHG claims the Debtor questioned its motivations and the means by which it built its position. (*Id.*)

The PIK AHG also reached out to Coulson and did not receive a response, as well as to Citibank, N.A., London Branch ("Citibank"), the trustee under the PIK Indenture, to request that Citibank not execute any amendment contemplated under the Recapitalization Transaction. (*Id.* ¶ 23.) Citibank's counsel responded noting that Citibank would be replaced by GLAS Trust Company LLC ("GLAS") as the trustee for the Secured PIK Notes and they had passed the PIK AHG letter to the Debtor's advisors. (*Id.* ¶ 24.) The PIK AHG then sent a letter to GLAS to reiterate its diligence request. (*Id.* ¶ 25.) GLAS stated it would not cooperate with the PIK AHG without evidence of their Secured PIK Note holdings. (*Id.*)

13

**H. The Debtor Agrees to Implement Its Subsidiaries' Deal for the Benefit of Its Parent Equity Holders**

On September 29, 2025, each of Ardagh Holdings USA Inc., Ardagh Packaging Finance PLC, and the Debtor launched consent solicitations (collectively, the "Consent Solicitation") in connection with the Recapitalization Transaction. (*Id.* ¶ 27.) The Debtor was unable to achieve the requisite level of consents from holders of Secured PIK Notes and instead signed a "Restructuring Implementation Agreement" with its subsidiaries, its equity owners, and its subsidiaries' creditors. (*Id.* ¶¶ 28-29.) The PIK AHG claims that it had not received a copy of the Restructuring Implementation Agreement despite requests.[6] (*Id.* ¶ 29.) By acquiescing to the Restructuring Implementation Agreement ("RIA"), the PIK AHG claims that the Debtor agreed to a detailed course of action that, *inter alia*, recognized a foreclosure on its equity interests by GLAS and committed to thereafter commence a JRP in Luxembourg (the "Manufactured Lien Stripping"). (*Id.*)

On November 12, 2025, the Ardagh Group notified the public of the launch of a private exchange where approximately 80% of Secured PIK Noteholders entered into an agreement pursuant to which those holders' Secured PIK Notes were transferred in exchange for their *pro rata* share of 7.5% of the total issued and outstanding EquityCo shares (together with the Recapitalization Transaction and all of its precedent and subsequent steps, the "Pre-JRP Out of Court Restructuring"). (*Id.* ¶ 30.) The Ardagh Group also announced that the Debtor had commenced the Luxembourg Proceeding. (*Id.*)

---

[6] The Court granted the PIK AHG request for production of the RIA, which was then produced to counsel for PIK AHG. The Court overruled the objection of the Foreign Debtor and admitted the RIA into evidence at the hearing.

14

On November 21, 2025, the PIK AHG appeared in the Luxembourg Proceeding and filed its *Requête en Intervention Volontaire* (the "Motion to Intervene"), which was denied by the Luxembourg Court. (*Id.* ¶ 31.)

## I. PIK Noteholder Objection

### 1. PIK AHG Argues that Recognition of the Luxembourg Proceeding Would Be Manifestly Contrary to Public Policy

The PIK AHG claims that the Luxembourg Proceeding violates the substantive rights of creditors in four ways.

#### a. *PIK AHG Argues that No Court Has Had Oversight of the Recapitalization Transaction*

First, the PIK AHG claims that the Luxembourg Proceeding constitutes the "culmination, rather than the consummation," of the Debtor's restructuring because the Luxembourg Proceeding was initiated after the Ardagh Group's restructuring had already occurred. (*Id.* ¶ 46.) The TSA, consent solicitation, and Debtor's entry into the Restructuring Implementation Agreement all occurred without any court supervision. (*Id.*) The PIK AHG takes further issue with the fact that the economic treatment proscribed in the TSA was completed before the Debtor's commencement of the Luxembourg Proceeding. (*Id.* ¶ 47.) The Ardagh Group's lenders had already exchanged their SSNs for new SSNs due in 2030, holders of Ardagh Group's SUNs had already exchanged their SUNs for 92.5% of the equity in EquityCo, and Coulson and other equity owners had already exchanged their equity interests for $300 million in cash. (*Id.*)

The PIK AHG claims that the Debtor consummated its restructuring before initiating the Luxembourg Proceeding. (*Id.* ¶ 48.) The Ardagh Group, on November 12, initiated a proceeding to effectuate its debt for equity swap, and immediately thereafter, the consenting Cross-Holders directed GLAS as collateral agent for the Secured PIK

Notes to foreclose on the Debtor's equity interests in Ardagh Group. (*Id.*) The PIK

Noteholders further allege that GLAS then purportedly transferred the foreclosed equity

interests to EquityCo and facilitated the payment of $300 million in cash to Existing

Equity. (*Id.*) Additionally, the consenting Cross-Holders' PIK Notes transferred their

PIK holdings to this new entity owning the equity in the Ardagh Group. (*Id.*)

The PIK AHG claims that the result of the Pre-JRP Out of Court Restructuring,

the Debtor purportedly no longer owns equity interests in anything. (*Id.* ¶ 50.) The

Debtor transferred its equity interest in its subsidiaries and only potentially holds claims

and causes of action against insiders that it intends to abandon in the Luxembourg

Proceeding. (*Id.*) The PIK AHG claims that the organizational chart contained at Exhibit

3 of the Petition is misleading, and provided its own organization chart that it believes

represents the current equity holdings of the Debtor, which is listed below:



(*Id.* ¶¶ 50-51.) Accordingly, the PIK AHG claims that the Debtor transferred all of its

assets to an affiliate for little to no consideration and did not negotiate and has not

presented evidence of its equitable, economic, or legal justifiability. (*Id.* ¶ 52.)

>　　　　　　　　　*b.  PIK AHG Argues that the Luxembourg Court Lacks
>　　　　　　　　　Jurisdiction to Review the Recapitalization Transaction*

Next, the PIK AHG contends that the Debtor's refusal to permit scrutiny of the Pre-JRP Out of Court Restructuring is particularly concerning given the PIK AHG's questions regarding the security interests of PIK Holders on the equity in Ardagh Group was purportedly stripped on November 12. (*Id.* ¶¶ 53-55.) The PIK AHG expresses specific concern regarding the final steps of implementation of the Restructuring Implementation Agreement that commenced the Ardagh Group's "amicable agreement" proceeding to effectuate its bilateral agreement with some of its debt holders under a separate Luxembourg restructuring law, which occurred "just hours before" the Debtor commenced the Luxembourg Proceeding. (*Id.* ¶ 55.)

The PIK AHG then claims that GLAS relied on the purported event of default to foreclose on the PIK Noteholders' security interest, despite refusing to permit a third-party assessment of the valuation of the underlying equity and refusing to release its own assessment of the value of the equity. (*Id.* ¶ 56.) However, the PIK AHG claims that the "amicable agreement" proceeding did not constitute an event of default under the Secured PIK Notes indenture and disputes the existence of any event of default throughout the restructuring negotiations through the commencement of the Luxembourg Proceeding. (*Id.* ¶ 57.) The PIK Indenture was not scheduled to mature until June 30, 2027, while the Group-level debt instruments were not scheduled to mature until 2026 and 2027. (*Id.*) Neither the Debtor, nor its subsidiary entities, had failed to make any coupon payments. (*Id.*)

The purported stripping of the Secured PIK Notes' lien is fundamental to the requests made by the Debtor in its Luxembourg proceeding because, but for the lien

stripping, the Secured PIK Notes would qualify as "extraordinary" creditors whose consent would be necessary for the approval of the Luxembourg Proceeding.  (*Id.* ¶ 59.)

> ### c.  *PIK AHG Agues the Luxembourg Proceeding Will Not Address the Legitimacy of the Coulson Payment*

The PIK AHG also claims that the Luxembourg Proceeding threatens the due process rights of the PIK AHG due to the Pre-JRP Out of Court Restructuring's transfer of value to Coulson and Existing Equity without paying the PIK Noteholders in full.  (*Id.* ¶ 60.)  The PIK AHG further claims that Coulson conditioned his support on the transfer of the Ardagh Group's on the receipt of a substantial payment.  (*Id.*)  The Cross-Holders opposed Coulson's position and filed suit against Coulson and the Debtor for fraudulent transfer.  (*Id.*)  The Cross-Holders eventually agreed to make the $300 million payment to Existing Equity in connection with the Pre-JRP Out-of-Court Restructuring, but the Debtor was not able to legally obtain recovery from the structure as long as the PIK Noteholders retained a lien on the underlying equity interests.  (*Id.* ¶ 61.)  However, the PIK AHG purports that the Cross-Holders presumptively agreed to the transfer because they had negotiated favorable economic recoveries form themselves at the Group level. (*Id.*)

The PIK AHG claims that the lack of information, discovery, and judicial inquiring around the consent payment to Existing Equity threatens the due process of the PIK AHG.  (*Id.* ¶ 62.)  Additionally, the PIK AHG claims that awarding value to Existing Equity, while wiping out structurally senior debt, is contrary to the absolute priority rule. (*Id.* ¶ 63.)  The PIK AHG notes, however, the courts have granted recognition to foreign proceedings that do not adhere to the absolute priority rule.  (*Id.* ¶ 64.)  The PIK AHG

distinguishes these cases noting that they have relied on foreign statutory procedures that have purported to protect the rights and expectations of U.S. creditors. (*Id.*)

Yet, the Luxembourg Proceeding would not typically permit awarding value to Existing Equity while haircutting senior creditors and the PIK AHG alleges this is why the violation of the absolute priority rule occurred before the Luxembourg Proceeding as part of the Pre-JRP Out of Court Restructuring. (*Id.* ¶ 65.) Stated otherwise, the PIK AHG believes the Coulson Payment would have not been permitted by the Luxembourg Court had the Debtor sought to effectuate the payment in the Luxembourg Proceeding. (*Id.*) Therefore, it effectuated the Coulson Payment before initiating the Luxembourg Proceeding to prevent the Luxembourg Court's oversight of the transaction. (*Id.*)

> d.    *PIK AHG Claims Its Members are Being Subordinated to the Views of Parent Equity and Other Insiders*

The PIK AHG further contends that its due process rights are violated because the Luxembourg Proceeding is premised on the consent of insiders to outvote the members of the PIK AHG. (*Id.* ¶ 66.) The Secured PIK Notes held by the consenting Cross-Holders were transferred to EquityCo as part of the Pre-JRP Out of Court Restructuring, and EquityCo has already agreed to support the Luxembourg Proceeding, and the Debtor has stated that the affirmative vote of its insiders would be dispositive for obtaining approval of the JRP. (*Id.* ¶¶ 66-67.) Therefore, the PIK AHG claims that the Luxembourg Proceeding threatens the only material third-party creditors of the Debtor and this Court should decline to recognize the Luxembourg Proceeding because it violates public policy. (*Id.* ¶ 68.) The PIK AHG claims that the Manufactured Lien Stripping in the Pre-JRP Out of Court Restructuring prevents the efficient and orderly distribution of the Debtor's assets and the lack of restrictions on insider voting are being weaponized by the fact that

19

the consenting Cross-Holders transferred their Secured PIK Notes to an insider shortly before the commencement of the Luxembourg Proceeding. (*Id.*) The PIK AHG also claims that the Luxembourg Proceeding would limit recovery for the holders of Secured PIK Notes and would effectively ratify the Coulson Payment. (*Id.*) Lastly, the Luxembourg Proceeding would permit the Debtor to place its equity interests beyond the reach of creditors in a way that is manifestly contrary to public policy. (*Id.*)

> 2. The PIK AHG Argues that Recognition of the Luxembourg Proceeding Would be Unprecedented and Unwarranted Because It Is <u>Not a Collective Proceeding</u>

The PIK AHG claims that the Foreign Representative carries the burden of establishing each of the seven criteria to demonstrate that the Luxembourg Proceeding is a "foreign proceeding" within the meaning of section 101(23) and as used in section 1517 of the Code. (*Id.* ¶¶ 70-71.)

The PIK AHG argues that the hallmark of a collective proceeding is whether all creditors' interests are considered in the proceeding. (*Id.* ¶ 72 (quotation omitted).) Additionally, courts have denied recognition where the hallmarks of a collective proceeding were not met at the time recognition was requested. (*Id.* ¶ 73.) The PIK AHG argues that the recognition of the Luxembourg Proceeding is a matter of first impression, as the governing law took effect on November 1, 2023. (*Id.* ¶ 74.) Further, the PIK AHG argues the fact that the Luxembourg Proceeding is described as a "collective proceeding" by its governing statute is not dispositive for this Court's interpretation of the proceeding. (*Id.*)

The PIK AHG contends that the Luxembourg Proceeding lacks aspects that would label it sufficiently "collective" to fall under section 101(23)'s definition of a foreign

proceeding. (*Id.* ¶ 75.) For example, the PIK AHG argues the Luxembourg Proceeding cannot examine the facts and circumstances of the Pre-JRP Out of Court Restructuring, which includes the Manufactured Lien Stripping that enabled the Coulson payment. (*Id.*) The Luxembourg Court, in an initial ruling, limited the scope of the Luxembourg Proceeding by forbidding the intervention of creditors directly affect by the Transaction. (*Id.*) The PIK AHG claims that the failure of the Luxembourg Court to inquire into the Pre-JRP Out of Court Restructuring upends protections for creditors rights and interest that is fundamental to the "collective" procedures as required by the Bankruptcy Code and fails to provide creditors meaningful court review of their treatment and classification. (*Id.*)

Lastly, the PIK AHG contends that the lack of creditor protection is particularly noteworthy in this matter, as creditor classification is fundamental to the Luxembourg Proceeding. (*Id.* ¶ 76.) The Luxembourg Proceeding requires that creditors fit into one of two classes, and to progress to a sanction hearing, the proposed plan must obtain a double majority by number and by value in at least one class. (*Id.*) The PIK AHG contends that but for the Manufactured Lien Stripping, the holders of Secured PIK Notes would have to be classified as secured creditors, and if they voted to reject the plan, it would "doom" the Luxembourg Proceeding. (*Id.*) Permitting the Manufactured Lien Stripping, however, would enable the Debtor to classify the PIK Noteholders as unsecured creditors whose votes to reject the plan would be overridden by accepting unsecured creditors, which the PIK AHG argues in this case are insiders. (*Id.*) The PIK AHG will otherwise be unable to challenge its classification in the Luxembourg Proceeding, while in the chapter 11 context, the PIK AHG would be afforded the

21

opportunity to challenge its classification. (*Id.*) Therefore, the PIK AHG claims that the

proceeding is not "collective" within the context of recognition and asks this Court to

deny the Recognition Motion. (*Id.*)

### J. The Reply

1. The Foreign Representative Argues the PIK AHG Does Not
   Meaningfully Dispute the Luxembourg Proceeding is Entitled to
   <u>Recognition</u>

The Foreign Representative begins his response by recounting that the he has

demonstrated that (i) the Luxembourg Proceeding meets all requirements of a foreign

main proceeding, (ii) that the Foreign Representative is a "person" within the meaning of

section 1502 of the Code, (iii) and that the Recognition Motion and associated filings

satisfy the requirements of section 1515, and that these issues are not in dispute. (Reply ¶

7.) Instead, the only disputed issue is whether the Luxembourg Proceeding is "collective

in nature." (*Id.*; *see also* Objection ¶¶ 69-76.)

The Foreign Representative contends that the Luxembourg Proceeding is

collective in nature for the following three reasons. First, the Luxembourg Proceeding

was commenced under a statute that permits the Luxembourg District Court to approve a

plan following a vote by relevant creditor class and approved by requisite majorities.

(Reply ¶ 8.) Second, the approved plan is binding on all affected creditors, and third,

creditors are able to debate and vote on the plan. (*Id.*)

The Foreign Representative claims that the PIK AHG's argument that the

Luxembourg Proceeding is not collective in nature because it fails to provide a

meaningful court review of creditors' treatment and classification. (*Id.* ¶ 9.) However,

the Foreign Representative claims that this argument lacks legal support. Moreover, the

Objection relies on communication pertaining to the Pre-JRP Out of Court Restructuring,

22

which the Foreign Representative claims is speculative, lacks authority, and mischaracterizes the role of the Luxembourg District Court. (*Id.* ¶ 10.)

The Foreign Representative notes that the Luxembourg Proceeding permits creditors to identify, assert, and protect their rights pursuant to a statutory framework. (*Id.* ¶ 11.) All creditors are identified, provided notice, and informed of the amount and classification of their claims. (*Id.*) Creditors are permitted to challenge the amount and classification of their claims before a court, and any creditor whose rights are affected by the plan are entitled to vote on that plan. (*Id.*) The statutory framework also follows established priority rules and provides distinctions for the treatment of creditors according to their unique types of claims. (*Id.* ¶ 12.) For example, the statutory framework distinguishes between holders of security interests, creditors with statutory preference rights, and certain public authorities. (*Id.*)

The Foreign Representative further submits that creditors have multiple means by which to obtain court review through the Luxembourg Proceeding. (*Id.* ¶ 13.) Creditors may contest claim determinations, seek the appointment of an interim administrator in cases of serious management misconduct, obtain automatic judicial review of the restructuring plan, appeal a confirmation decision, and request revocation of a plan that cannot be fulfilled and harm their interests. (*Id.*) The Luxembourg Court may also examine whether the plan's approval depends on votes cast by intragroup creditors and may disregard those votes when determining whether to approve a plan. (*Id.* ¶ 14.)

The Foreign Representative contends that, for the above-mentioned reasons, the Luxembourg Proceeding is collective in nature. (*Id.* ¶ 15.) The Luxembourg Court's denial of the PIK AHG's intervention was denied solely on the basis that the application

23

was premature and the PIK AHG still maintains the ability to participate in the Luxembourg proceeding. (*Id.*)

2. Recognition of the Luxembourg Proceeding Would Not Contravene U.S. Public Policy

Next, the Foreign Representative notes that the public-policy exception is narrow in scope and claim that the case law cited by the PIK AHG is not applicable to the case at hand. (*Id.* ¶¶ 16-17.) The Foreign Representative then argues that the PIK AHG has failed to meet the requirements of section 1506 because its public policy objection focuses on the claim that the Luxembourg Proceeding deprives noteholders of the opportunity to exercise its substantive rights as creditors. (*Id.* ¶ 18.)

a. *The Luxembourg Proceeding is Fundamentally Fair and Does Not Impinge on U.S. Due Process Rights*

The Foreign Representative believes that both parties agree that the purpose of the Luxembourg Proceeding is to develop a reorganization plan that provides, *inter alia*, for a debt-to-equity conversion of PIK Notes, with the goal of enabling the Debtor to restructure its existing indebtedness and restore financial viability. (*Id.* ¶ 19.) The Foreign Representative outlines how creditors are afforded meaningful protections, may submit and litigate their claims in an adversarial process, how restructuring plans must comply with the principle of creditors' best interest and provide for *pari passu* treatment. (*Id.* ¶ 20.) The Luxembourg District Court is also permitted to reject a proposed plan that unduly burdens non-consenting creditors or contravenes public order. (*Id.*)

The Foreign Representative also further asserts that the PIK AHG's claims that their voices cannot be heard and that their rights are not protected under the Luxembourg Proceeding is false. (*Id.* ¶ 21.) Additionally, the Foreign Representative's claims that the PIK AHG's true complaint pertains to the Pre-JRP Out of Court Restructuring, and not

24

with the Luxembourg Proceeding itself.  (*Id.* ¶ 22.)  Yet, the Foreign Representative claims that the PIK AHG's complaints about the Pre-JRP Out of Court Restructuring have no bearing on the recognition of the Luxembourg Proceeding.  (*Id.* ¶ 23.)  For example, the Foreign Representative contends that the purpose of chapter 15 is to, *inter alia*, "promote international cooperation legal certainty, fair and efficient administration of cross-border insolvencies," which is directly implicated through the Debtors' Recognition Motion, which seeks to remove obstacles to the Luxembourg Proceeding and prevent piecemeal litigation from impeding the Debtor's restructuring.  (*Id.* (quoting *In re Fairfield Sentry Ltd.*, 714 F.3d 127, 132 (2d Cir. 2013)).)

The Foreign Representative argues that the scope of the Luxembourg Proceeding is narrower than what the PIK AHG wishes, however, the Foreign Representative claims that this fact alone is not a basis to deny the Recognition Motion.  (*Id.* ¶ 24.)  Instead, for the PIK AHG to challenge the Pre-JRP Out of Court restructuring, it may seek relief in an appropriate court.  (*Id.* ¶ 25.)  The Foreign Representative claims that recognition is appropriate in order to ensure that all holders of PIK Notes will have their claims adjudicated in a single proceeding and prevent the Debtor from being forced to spend resources engaging in piecemeal litigation.  (*Id.* ¶ 26.)  Moreover, the PIK AHG's rights under Luxembourg law are preserved and the PIK AHG has failed to demonstrate any prejudice that they would face if the Court granted the Recognition Motion.  (*Id.* ¶¶ 25-26.)

> b.  *U.S. Bankruptcy Courts Have Not Applied Section 1516 to Deny Recognition under Comparable Circumstances*

Recounting that the public-policy exception is narrow, the Foreign Representative argues that the two cases from this District relied upon by the PIK AHG are

25

distinguishable and fail to provide a basis for this Court to abandon its precedent in rejecting section 1516 challenges in chapter 15 proceedings. (*Id.* ¶¶ 27-28.)

Unlike what the PIK AHG suggests, *In re Toft*, 153 B.R. 186 (Bankr. S.D.N.Y. 2011), does not provide a legitimate basis to deny recognition because the foreign representative in that case initiated a chapter 15 proceeding for the purpose of obtaining access to the debtor's email accounts that were stored on U.S. servers. (*Id.* ¶ 28.) The Foreign Representative characterizes the court's denial of the requested relief as due to the foreign representative effectively seeking a wiretap, which is unavailable under U.S. law, as a violation of the Electronic Communications Privacy Act and potentially a criminal act. (*Id.*) Regarding the Foreign Representative's reliance on *In re Millard*, 501 B.R. 644 (Bankr. S.D.N.Y. 2013), the Foreign Representative claims that this case actually supports his own case, as the court declined to apply section 1506 of the Code, because the foreign representative sought recognition in order to prevent asset-seizure, which the Foreign Representative then analogizes to the piecemeal litigation he seeks to avoid through the filing of the Recognition Motion. (*Id.*)

The Foreign Representative concludes by stating that the remaining out-of-district case cited by the PIK AHG similarly fails to provide a basis for an application of section 1506 of the Code and the PIK AHG has failed to demonstrate that the Luxembourg Proceeding does not afford creditors sufficient protection and accordingly, the Luxembourg Proceeding is not manifestly contrary to U.S. public policy.

26

## II.    LEGAL STANDARD

### A.  Eligibility to File under Chapter 15

"Foreign debtors seeking relief under chapter 15 must satisfy the debtor eligibility requirements set forth in section 109(a) of the Bankruptcy Code." *In re Servicos de Petroleo Constellation S.A.*, 600 B.R. 237, 268 (Bankr. S.D.N.Y. 2019).  Section 109(a) provides that "only a person that resides or has a domicile, a place of business, or property in the United States, or a municipality, may be a debtor" under the Code.  11 U.S.C. § 109(a).  Where a foreign debtor does not have a place of business in the United States, the question often arises whether the foreign debtor has "property in the United States" as a condition precedent to eligibility under section 1517.  *See In re Cell C Proprietary Ltd.*, 571 B.R. 542, 550–52 (Bankr. S.D.N.Y. July 27, 2017).  Section 109(a) does not address how much property must be present or when or how long property must have a situs in the United States.  As this Court explained in *In re U.S. Steel Canada Inc.*, 571 B.R. 600 (Bankr. S.D.N.Y. July 31, 2017):

> Some courts, including this one, have held that an undrawn retainer in a United States bank account qualifies as property in satisfaction of section 109(a).  *See, e.g.*, *In re Octaviar Admin. Pty Ltd.*, 511 B.R. 361, 372–73 (Bankr. S.D.N.Y. 2014) ("There is a line of authority that supports the fact that prepetition deposits or retainers can supply 'property' sufficient to make a foreign debtor eligible to file in the United States.") (citing *In re Cenargo Int'l PLC*, 294 B.R. 571, 603 (Bankr. S.D.N.Y. 2003)); *see also In re Berau Capital Resources Pte Ltd.*, 540 B.R. 80, 82 (Bankr. S.D.N.Y. 2015) ("The Court is satisfied that the retainer provides a sufficient basis for eligibility in this case."); *In re Global Ocean Carriers Ltd.*, 251 B.R. 31, 39 (Bankr. D. Del. 2000) (holding that a $400,000 retainer paid on behalf of the debtors to bankruptcy counsel in that case qualifies as sufficient property in the United States under section 109(a)).
>
> Further, "[c]ontracts create property rights for the parties to the contract. A debtor's contract rights are intangible property of the debtor." *Berau Capital*, 540 B.R. at 83 (citing *U.S. Bank N.A. v.*

27

> *Am. Airlines, Inc.*, 485 B.R. 279, 295 (Bankr. S.D.N.Y. 2013), aff'd,
> 730 F.3d 88 (2d Cir. 2013)).  Those property rights can be and
> typically are tied to the location of the governing law of the contract.
> *See id*. at 84 (holding that the situs of intangible property rights
> governed by New York law was New York).  Accordingly, debt
> subject to a New York governing law clause and a New York forum
> selection clause constitutes property in the United States.  *See In re*
> *Inversora Eléctrica de Buenos Aires S.A.*, 560 B.R. 650, 655 (Bankr.
> S.D.N.Y. 2016) ("[D]ollar-denominated debt subject to New York
> governing law and a New York forum selection clause is
> independently sufficient to form the basis for jurisdiction.") (citation
> omitted); *Berau Capital*, 540 B.R. at 84 ("The Court concludes that
> the presence of the New York choice of law and forum selection
> clauses in the Berau indenture satisfies the section 109(a) 'property
> in the United States' eligibility requirement.") (footnote omitted).

*Id*. at 610; *see also In re Suntech Power Holdings Co.*, 520 B.R. 399, 412–13 (Bankr.

S.D.N.Y. 2014) (concluding that establishment of a bank account in New York prior to

commencement of the chapter 15 proceeding was sufficient to satisfy section 109(a)); *In*

*re Paper I Partners, L.P.*, 283 B.R. 661, 674 (Bankr. S.D.N.Y. 2002) (finding that

debtors' maintenance of original business documents in the United States constituted

"property in the United States" under section 109); *Berau Capital*, 540 B.R. at 83-84

("The Court concludes that the presence of the New York choice of law and forum-

selection clauses in the Berau indenture satisfies the section 109(a) 'property in the

United States' eligibility requirement."); *In re Servicos de Petroleo Constellation S.A.*,

600 B.R. at 269 ("This Court has previously held that a debtor's contract rights, including

rights pursuant to debt that is governed by New York law and contains a forum-selection

clause, constitute intangible property of the debtor in New York for purposes of section

109(a)."); s*ee also Wallach v. Nowak (In re Sherlock Homes of W.N.Y., Inc.)*, 246 B.R.

19, 23–24 (Bankr. W.D.N.Y. 2000) (stating that listing contracts between the

debtor/broker dealer and prospective sellers bestowed contractual rights upon the parties

and the contract rights were assets of the debtor); *Slater v. Town of Albion (In re Albion Disposal, Inc.)*, 217 B.R. 394, 407–08 (W.D.N.Y. 1997) (noting that "it is well-established . . . that a debtor's contractual rights—including rights arising under post-petition contracts—are included in the property of the estate").

### B.  Proper Venue for Chapter 15

28 U.S.C. § 1410 governs venue for cases under chapter 15, and provides that chapter 15 proceedings may be

> commenced in the district court of the United States for the district—(1) in which the debtor has its principal place of business or principal assets in the United States; (2) if the debtor does not have a place of business or assets in the United States, in which there is pending against the debtor an action or proceeding in a Federal or State court; or (3) in a case other than those specified in paragraph (1) or (2), in which venue will be consistent with the interests of justice and the convenience of the parties, having regard to the relief sought by the foreign representative.

28 U.S.C. § 1410.

Section 1410 establishes a "hierarchy of choices."  1 ALAN N. RESNICK & HENRY J. SOMMER, COLLIER ON BANKRUPTCY ¶ 4.04[1] (16th ed. 2014) ("Collier") (quoting H.R. REP. NO. 109–31, at 119 (2005)).  "If the debtor maintains its principal place of business or principal assets in the United States in a particular district, venue must be placed in that district; if not, we turn to subparagraph two.  If there is no litigation pending against the debtor in a district, subparagraph three then applies." *Suntech Power Holdings*, 520 B.R. at 414.

29

**C.  Foreign Proceeding Recognition under Section 1517(a)**

Section 1517(a) of the Bankruptcy Code establishes three requirements for the

recognition of a foreign proceeding under chapter 15.  In order to recognize the foreign

proceeding, a court must conclude that:

> (1) The foreign proceeding constitutes a "foreign main proceeding"
> or a "foreign nonmain proceeding" as defined under section 1502;
> (2) The foreign representative applying for recognition is a
> person or body; and
> (3) The petition meets the requirements of section 1515.

11 U.S.C. § 1517(a).

Recognition of the foreign proceeding is statutorily mandated if the three

requirements of section 1517(a) are met, and no exception is applicable.  *See In re*

*Millard*, 501 B.R. at 651.

> 1.  Section 1517(b)(1): Foreign Main Proceeding Recognition

Section 1517(a) of the Bankruptcy Code distinguishes between "foreign main"

and "foreign nonmain" proceedings.  Section 1517(b) establishes conditions for

recognition of each.

In relevant part, section 1517(b)(1) states that a foreign proceeding shall be

recognized "as a foreign main proceeding if it is pending in the country where the debtor

has the center of its main interests."  11 U.S.C. § 1517(b)(1).  Section 1502(4) uses the

same language to define "foreign main proceeding."  11 U.S.C. § 1502(4).

> a.  *Foreign Proceeding*

Section 101(23) defines a "foreign proceeding" as:

> [A] collective judicial or administrative proceeding in a foreign
> country, including an interim proceeding, under a law relating to
> insolvency or adjustment of debt in which proceeding the assets and
> affairs of the debtor are subject to control or supervision by a foreign
> court, for the purpose of reorganization or liquidation.

30

11 U.S.C. § 101(23).  Based on this definition, courts have held that a "foreign

proceeding" requires:

> (i) [the existence of] a proceeding;
> (ii) that is either judicial or administrative;
> (iii) that is collective in nature;
> (iv) that is in a foreign country;
> (v) that is authorized or conducted under a law related to insolvency or the adjustment of debts;
> (vi) in which the debtor's assets and affairs are subject to the control or supervision of a foreign court; and
> (vii) which proceeding is for the purpose of reorganization or liquidation.

*See Armada (Singapore) Pte Ltd. v. Shah (In re Ashapura Minechem Ltd.)*, 480 B.R. 129,

136 (S.D.N.Y. 2012) (citing *In re Betcorp Ltd.*, 400 B.R. 266, 277 (Bankr. D. Nev.

2009)); *In re ENNIA Caribe Holding N.V.*, 594 B.R. 631, 638 (Bankr. S.D.N.Y. 2018); *In

re Agro Santino, OOD*, 653 B.R. 79 (Bankr. S.D.N.Y. 2023).

### b.  Center of Main Interests

The Bankruptcy Code does not define the term "center of main interests"

(COMI).  However, section 1516(c) provides that, in the absence of an objection or

evidence to the contrary, a debtor's registered office or habitual residence "is presumed to

be the center of the debtor's main interests."  11 U.S.C. § 1516(c); *see also In re Olinda

Star I*, 614 B.R. 28, 41 (Bankr. S.D.N.Y. 2020); *In re Ocean Rig UDW Inc.*, 570 B.R.

687, 705 (Bankr. S.D.N.Y. 2017); *In re ABC Learning Centres Ltd.*, 445 B.R. 318, 333

(Bankr. D. Del. 2010), *aff'd,* 728 F.3d 301 (3d Cir. 2013) (internal citations omitted).

The relevant temporal anchor for the determination of the location of the debtor's COMI

is the date on which the chapter 15 petition is filed.  S*ee Morning Mist Holdings Ltd. v.

Krys (In re Fairfield Sentry Ltd.)*, 714 F.3d 127, 137 (2d Cir. 2013) (hereinafter

"*Fairfield Sentry*").

31

In assessing whether a movant challenging the registered office presumption has overcome that presumption, courts in this District have applied a list of non-exclusive factors, including: (i) the location of the debtor's headquarters; (ii) the location of those who actually manage the debtor; (iii) the location of the debtor's primary assets; (iv) the location of the majority of the debtor's creditors, or a majority of the creditors who would be affected by the case; and (v) the jurisdiction whose law would apply to most disputes. *Fairfield Sentry*, 714 F.3d at 137 (citing *In re SPhinX, Ltd.*, 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006)). While these factors offer a "helpful guide" in determining a debtor's COMI, they are not exclusive, consideration of these specific factors is "neither required nor dispositive," and courts are cautioned against their "mechanical application." *Fairfield Sentry*, 714 F.3d at 137 (citing *SPhinX*, 351 B.R. at 117).

Additionally, in determining a debtor's COMI, the Second Circuit and this Court have examined the expectations of creditors and other interested parties, as a company's COMI must be "ascertainable by third parties." *See Fairfield Sentry*, 714 F.3d at 136–38; *In re Millennium Global Emerging Credit Master Fund Ltd.*, 474 B.R. 88, 93 (S.D.N.Y. 2012). As the Second Circuit has explained, by examining factors "in the public domain," courts are able to evaluate whether a debtor's COMI is in fact "regular and ascertainable [and] not easily subject to tactical removal." *See Fairfield Sentry*, 714 F.3d at 136–37. The expectations of creditors can be assessed through examination of the public documents and information available to guide creditor understanding of the nature and risks of their investments." *In re Oi Brasil Holdings Cooperatief U.A.*, 578 B.R. 169, 228 (Bankr. S.D.N.Y. 2017). In practice, courts evaluate creditor expectations by reviewing has disclosures in offering memoranda, indentures, and similar documentation.

32

*See id*. at 228–32 (analyzing noteholder expectations, as set forth in offering memorandum, as part of COMI inquiry); *In re OAS S.A.*, 533 B.R. 83,102–03 (Bankr. S.D.N.Y. 2015) (same); *Millennium Glob.*, 474 B.R. at 93–94 (same); *In re Suntech Power Holdings*, 520 B.R. at 418 (reviewing indenture agreement provisions to establish creditor expectations regarding likely location of a restructuring as part of COMI inquiry).

As discussed, the determination of a debtor's COMI should be based on facts available at or around the time the chapter 15 petition is filed.  *Fairfield Sentry,* 714 F.3d at 137.  The Second Circuit in Fairfield Sentry clarified that "the factors that a court may consider in this analysis are not limited and may include the debtor's liquidation activities."  *Id*. at 138; *see also In re Modern Land (China) Co., Ltd*., 641 B.R. 768, 783 (Bankr. S.D.N.Y. 2022) (finding that a Cayman Islands court's supervision of a debtor's scheme of arrangement established the Cayman Islands as the debtor's COMI, despite the debtor's real estate investments in China and the United States, when creditor expectations were considered).  Pre-filing restructuring efforts may shift a debtor's COMI, particularly where the debtor is an entity with such limited operations that restructuring activity constitutes its "primary business activity" prior to the filing of the chapter 15 petition.  *Modern Land*, 641 B.R. at 789–90.

2.  Section 1517(b)(2): Foreign Non-main Proceeding Recognition

The Bankruptcy Code provides that a foreign proceeding shall be recognized as a "foreign nonmain proceeding" if the debtor has an "establishment" in the country in which the foreign proceeding is pending.  11 U.S.C. §§ 1502(5), 1517(b)(2).  An "establishment" is "any place of operations where the debtor carries out a nontransitory

economic activity." 11 U.S.C. § 1502(2). Courts have held that the location should "constitute a 'seat for local business activity' for the debtor. The terms 'operations' and 'economic activity' require a showing of a local effect on the marketplace, more than mere incorporation and record-keeping and more than just the maintenance of property." *In re Creative Fin., Ltd. (In Liquidation)*, 543 B.R. 498, 520 (Bankr. S.D.N.Y. 2016).

### 3. Section 1517(a)(2): Foreign Representative Recognition

The term "foreign representative" is defined in section 101(24) of the Bankruptcy Code as "[A] person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding." 11 U.S.C. § 101(24).

### 4. Section 1517(a)(3): Section 1515 and Rule 1007 Requirements

Section 1515 separately imposes the following procedural requirements:

(a)     A foreign representative applies to the court for recognition of a foreign proceeding in which the foreign representative has been appointed by filing a petition for recognition.

(b)     A petition for recognition shall be accompanied by—

(1)     a certified copy of the decision commencing such foreign proceeding and appointing the foreign representative;

(2)     a certificate from the foreign court affirming the existence of such foreign proceeding and of the appointment of the foreign representative; or

(3)     in the absence of evidence referred to in paragraphs (1) and (2), any other evidence acceptable to the court of the existence of such foreign proceeding and of the appointment of the foreign representative.

34

(c)    A petition for recognition shall also be accompanied by a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative.

(d)    The documents referred to in paragraphs (1) and (2) of subsection (b) shall be translated into English. The court may require a translation into English of additional documents.

11 U.S.C. § 1515.  Additionally, Bankruptcy Rule 1007 imposes additional procedural requirements, including the filing of a corporate disclosure statement.  FED. R. BANKR. P. 1007.

### D.  Automatic Relief Under Section 1520

Section 1520(a) of the Bankruptcy Code sets forth a series of statutory protections that automatically result from the recognition of a foreign main proceeding, including the application of the protection afforded by the automatic stay under section 362(a) of the Bankruptcy Code to the Debtor and its property located within the territorial jurisdiction of the United States.  *See* 11 U.S.C. § 1520(a).

### E.  Application of Section 1521 Stay to Debtor and Non-Debtors

There is not a reciprocal automatic stay placed on non-debtors in interest.  Courts may grant relief under section 1521 of the Bankruptcy code, which allows a court to grant a foreign representative "any appropriate relief" where necessary to effectuate the purpose of chapter 15 and to protect the debtor's assets or creditors' interests.  11 U.S.C. § 1521.  This includes section 1521(a)(7), which allows a court to "grant[] any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a)."  *Id.*  Courts have in turn utilized section 105(a) of the Bankruptcy Code, which allows for the court to "issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [title 11]," 11 U.S.C. §

35

105(a), to apply the stay to third parties when "a claim against the non-debtor will have an immediate adverse economic consequence for the debtor's estate." *Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282, 287 (2d Cir. 2003).

### F. Limitations to Section 1521 Relief

In granting relief under section 1521, the court must also adhere to section 1522(a), which permits the Court to grant relief only if the interest of creditors are "sufficiently protected." "Sufficient protection" embodies "three basic principles: 'the just treatment of all holders of claims against the bankruptcy estate, the protection of U.S. claimants against prejudice and inconvenience in the processing of claims in the [foreign] proceeding, and the distribution of proceeds of the [foreign] estate substantially in accordance with the order prescribed by U.S. law.'" *In re Odebrecht Engenharia e Construcao S.A. - Em Recuperacao Jud.*, 669 B.R. 457, 474 (Bankr. S.D.N.Y. 2025) (citing *In re Atlas Shipping A/S*, 404 B.R. 726, 741 (Bankr. S.D.N.Y. 2009)).

### G. Section 1506 Requirements

Any relief that is appropriate under sections 1507, 1517, 1520, or 1521 still must not run afoul of section 1506. Section 1506 precludes any relief requested under the provisions in Chapter 15 that is "manifestly contrary to the public policy of the United States." 11 U.S.C. § 1506; *see In re Ephedra Prods. Liab. Litig.*, 349 B.R. 333, 336 (S.D.N.Y. 2006) (the public policy exception embodied in section 1506 should be "narrowly interpreted, as the word 'manifestly' in international usage restricts the public policy exception to the most fundamental policies of the United States") (citing H.R.Rep. No. 109–31(I), at 109, *reprinted in* 2005 U.S.C.C.A.N. 88, 172) (grammatical changes omitted). The public policy exception should only be invoked "under exceptional

circumstances concerning matters of fundamental importance for the United States." *In re Black Gold S.A.R.L.*, 635 B.R. 517, 528 (B.A.P. 9th Cir. 2022) (collecting cases).  In evaluating this "narrow" exception, courts consider the whether the foreign "insolvency laws or procedural protections for creditors" are "repugnant" to U.S. law, not the "misconduct or bad faith" of petitioners.  *Id.* at 529.

Congress provided courts additional instructions when interpreting the phrase "manifestly" in the context of section 1506, noting "[t]he word 'manifestly' in international usage restricts the public policy exception to the most fundamental policies of the United States," which is the standard meaning ascribed to the term "manifestly" in international law when describing a nation's public policy.  H.R.Rep. No. 109–31(I), at 109, *as reprinted in* 2005 U.S.C.C.A.N. 88, 172; *In re Ephedra Prods. Liab. Litig.*, 349 B.R. at 336.  Moreover, the official Guide to the Enactment of the Model Law on Cross–Border Insolvency expressly states that

> [t]he purpose of the expression "manifestly," used also in many other international legal texts as a qualifier of the expression "public policy," is to emphasize that public policy exceptions should be interpreted restrictively and that article 6 is only intended to be invoked under exceptional circumstances concerning matters of fundamental importance for the enacting State.

Guide to Enactment of the UNCITRAL Model Law on Cross–Border Insolvency, ¶ 89, U.N. Doc A/CN.9/442 (1997).  The House Judiciary Committee noted that the Guide "should be consulted for guidance as to the meaning and purpose of [Chapter 15's] provisions."  H.R.Rep. No. 109–31(I), at 106 n. 101, *as reprinted in* 2005 U.S.C.C.A.N. 169 n. 101; *see also In re Ephedra Prods. Liab. Litig.*, 349 B.R. at 336.

In order to determine if foreign proceedings are "manifestly contrary to the public policy of the United States," federal courts have considered whether a foreign proceeding

lacked certain common elements of American practice.  As Judge Rakoff noted in

*Ephedra.*, as early as 1895, the Supreme Court held that a foreign judgment should

generally be accorded comity if "its proceedings are according to the course of a civilized

jurisprudence," *i.e.*, fair and impartial.  *Id.* at 336 (quoting *Hilton v. Guyot,* 159 U.S. 113,

205–06 (1895)); *see also In re Asbestos Corp. Ltd.*, No. 25-10934 (MG), 2025 WL

3023332, at *7 (Bankr. S.D.N.Y. Oct. 29, 2025).  The Second Circuit reaffirmed this

approach in *Ackermann v. Levine*, 788 F.2d 830 (2d Cir. 1986), noting the "narrowness of

the public policy exception to enforcement . . . of foreign judgments," adding that, "[a]s

Judge Cardozo so lucidly observed: 'We are not so provincial as to say that every

solution of a problem is wrong because we deal with it otherwise at home.'"  *Ackermann*,

788 F.2d at 842 (quoting *Loucks v. Standard Oil Co. of New York*, 224 N.Y. 99, 111

(1918)).

## III.    DISCUSSION

For the reasons discussed below, the Court **GRANTS** the Recognition Motion

and finds that (i) Foreign Representative was properly appointed (ii) the Luxembourg

Proceeding is a foreign main proceeding, (iii) the Debtor's center of main interest is in

Luxembourg, (iv) the Debtor has an establishment in Luxembourg, and (iv) the requested

relief is not manifestly contrary to U.S. public policy.

### A.  Eligibility Under Section 109(a) of the Code

The Debtor has deposited a retainer with the Glenn Agre Bergman & Fuentes

LLP, a New York-based law firm, which is currently held in a client trust account in New

York.  (Scheon Decl. ¶ 7.)  This Court has previously found that a retainer deposited with

a New York-based law firm is sufficient to satisfy section 1519 of the Code.  *In re Iovate*

38

*Health Scis. Int' Inc.*, 673 B.R. 516, 524 (Bankr. S.D.N.Y. 2025); *Berau Capital*, 540

B.R. at 82; *In re B.C.I. Finances Pty Ltd.*, 671 B.R. 669, 672 (Bankr. S.D.N.Y. 2025)

("The settled rule that a debtor's creation of an attorney retainer in the United States

satisfies section 109(a) is well-founded, and the Court will follow it.")

Additional grounds exist to satisfy section 109(a) of the Code. The PIK Notes

contain a New York choice-of-law provision and a New York forum-selection clause.

(Schoen Decl. ¶ 3.) This Court has previously held that a choice-of-law provision and

forum-selection clause in favor of New York is sufficient to constitute property in the

United States in satisfaction of section 109(a) of the Code. *Berau Capital*, 540 B.R. at

84.

Accordingly, the Debtor is eligible to file under chapter 15 of the Code.

**B. The Luxembourg Proceeding is a "Foreign Main Proceeding"**

1. The Luxembourg Proceeding is a "Foreign Proceeding"

The Debtor has sufficiently demonstrated that the Luxembourg Proceeding is a

"Foreign Main Proceeding" within the meaning of section 1517 of the Code. Section

1517 provides that "(1) such foreign proceeding . . . is a foreign main proceeding or

foreign nonmain proceeding within the meaning of section 1502; (2) the foreign

representative applying for recognition is a person or body; and (3) the petition meets the

requirements of section 1515." 11 U.S.C. § 1517(a).

Section 101(23) of the Code defines "foreign proceeding" as follows:

> a collective judicial or administrative proceeding in a foreign
> country, including an interim proceeding, under a law relating to
> insolvency or adjustment of debt in which proceeding the assets and
> affairs of the debtor are subject to control or supervision by a foreign
> court, for the purpose of reorganization or liquidation.

39

11 U.S.C. § 101(23).  The PIK AHG contests that the Luxembourg Proceeding is not

"collective in nature" as mandated by section 101(23) of the Code.  (Objection ¶ 75.)

Collective in nature is interpreted by courts in this district, and others, as

primarily focusing on "whether a proceeding is collective is whether *all* creditors'

interests were considered in the proceeding." *Ashapura Minechem*, 480 B.R. at 140

(emphasis in original); *In re Manley Toys Ltd.*, 597 B.R. 578, 582 (D.N.J. 2019) ("A

proceeding is collective if it considers the rights and obligations of all creditors.")  "Other

characteristics of a collective proceeding include: adequate notice to creditors under

applicable foreign law, provisions for the distribution of assets according to statutory

priorities, and a statutory mechanism for creditors to seek court review of the

proceeding." *In re PT Bakrie Telecom Tbk*, 628 B.R. 859, 873 (Bankr. S.D.N.Y. 2021)

(internal quotation omitted).

The Nickels Declaration extensively details the requirements and overall process

demonstrating that the Luxembourg Proceeding constitutes a "foreign proceeding."  For

example, Mr. Nickels notes, *inter alia*, that the Luxembourg Proceeding is administrated

in accordance with strict statutory requirements, division of classes of creditors, robust

voting procedures, must be in the best interest of creditors, including that foreign

creditors may not be treated less favorably than creditors from Luxembourg.  (Nickels

Decl. ¶¶ 10-21.)  Additionally, the Nickels Declaration also establishes that the

Luxembourg Proceeding is sufficiently judicial in nature, as the Luxembourg Proceeding

involves the exercise of supervisory powers of the court.  (*See id.*)

The PIK AHG fails to provide sufficient evidence that the Luxembourg

Proceeding does not consider the rights of all creditors.  The PIK AHG notes that the fact

40

the Luxembourg Court will not yet consider the facts and circumstances surrounding the Pre-JRP Out of Court Restructuring violates the rights of creditors by failing to provide a meaningful review of their treatment and classification. However, this assertion mischaracterizes the Luxembourg Proceeding. As the Foreign Representative has demonstrated, the Luxembourg Proceeding operates pursuant to a statutory framework that provides the ability for creditors to challenge the amount, classification, and qualifications of its claim before the Luxembourg Court. (Supp. Nickels Decl. ¶ 6; n. 3.) Creditors may appeal against a judgment approving a restructuring plan, the restructuring plan is reviewed by the Luxembourg Court and must comply with Luxembourg law and the best interests of the creditors. (*Id.* ¶ 8.) The PIK AHG contends they were improperly stripped of their security interests and improperly classified with the SUNs. The time and place for the PIK AHG to raise this argument is in the Luxembourg Proceeding. All creditors whose claims are impacted are entitled to vote on the plan. (*Id.* ¶ 6.) The Luxembourg Proceeding, therefore, contains robust protections for creditors and is "collective in nature."

Accordingly, the Court finds that the Luxembourg Proceeding is a foreign main proceeding within the meaning of section 101(23) of the Code.

### 2. The Debtor's COMI Is Luxembourg

The Debtor's COMI is also located in Luxembourg. The Foreign Representative has demonstrated that the Debtor's registered office is in Luxembourg, is incorporated under Luxembourg law, its directors are located in Luxembourg, all board meetings have taken place in Luxembourg, the Debtor maintains a bank account in Luxembourg, and the Debtor's books and records are maintained in Luxembourg. (Schoen Decl. ¶¶ 6-7, 15.)

41

The Debtor has accordingly demonstrated by a preponderance of the evidence that the Debtor's COMI is Luxembourg, and that the Court should recognize the Luxembourg Proceeding as a "foreign main proceeding" pursuant to section 1502(4) and 1517(b)(1) of the Code.

### C. The Public-Policy Exception Under Section 1506

The PIK AHG has failed to demonstrate that the Luxembourg Proceeding runs afoul of section 1506. The public-policy exception is an exacting standard, and the PIK AHG must demonstrate the existence of "exceptional circumstances concerning matters of fundamental importance for the United States." *Black Gold*, 635 B.R. at 528.

The thrust of the Objection focuses on the fact that the Luxembourg Proceeding has not, and perhaps will not, examine the facts and circumstances of the Pre-JRP Out of Court Restructuring. That conclusion is premature. The Luxembourg Court has not so far ruled on that objection and it will depend on Luxembourg law. (*See* Supp. Nickels Decl. ¶ 10.)

Moreover, the fact that the Luxembourg Proceeding does not examine the Pre-JRP Out of Court Restructuring does not, on its own, indicate that the Proceeding is contrary to the public policy of the United States. Instead, as discussed *supra* § III.B.1., creditors have robust protections in the Luxembourg Proceeding. Moreover, the PIK AHG has failed to identify problems with the Luxembourg Proceeding itself that warrant a denial of recognition under section 1506.

The PIK AHG cites to a variety of cases where courts have denied recognition on section 1506 grounds. These cases are dissimilar to the facts and circumstances of the instant proceeding. The Foreign Representative is correct that the court in *In re Toft*

42

denied recognition to prevent the usage of chapter 15 as a means to enable the foreign representative to access emails held on U.S. servers, which effectively constituted a wiretap, and was unavailable under U.S. law, as a violation of the Electronic Communications Privacy Act and potentially a criminal act.  453 B.R. at 197-198.  In *In re Vitro, S.A.B. de C.V.*, 473 B.R. 117 (Bankr. N.D. Tex.), *aff'd sub nom. In re Vitro S.A.B. de CV*, 701 F.3d 1031 (5th Cir. 2012),[7] the court found that voting irregularities, such as the foreign court permitting insiders who were issued bonds shortly before the filing of foreign plan to vote, swamped the vote of the noteholders, and warranted denial of recognition under the public policy exception.[8]  *Id.* at 132.  Other cases are similarly unavailing.[9]

Therefore, the recognition of the Luxembourg Proceeding would not violated U.S. public policy.

### D. The Debtor has Satisfied the Additional Requirements of Section 1515 and Rule 1007

The Debtor has satisfied section 1517(a) of the Code, which requires that the Foreign Representative that seeks recognition to be a "person or body."  *See* 11 U.S.C. § 1517(a)(2).  The Foreign Representative is a "person" as defined by section 101(41) of the Code.  The Foreign Representative has also satisfied section 1515 of the Code by (i)

---

[7]     Judge Hale also noted that the proposed foreign plan would violate the absolute priority rule. *Vitro, S.A.B. de C.V.*, 473 B.R. at 132.

[8]     Notably, in affirming the result reached by the bankruptcy court, the Circuit did so without reaching the public policy exception of section 1506.

[9]     *In re Millard*, 501 B.R. 644 (Bankr. S.D.N.Y. 2013) (declining to apply the public-policy exception); *In re Nexgenesis Holdings Ltda.*, 662 B.R. 406, 419 (Bankr. S.D. Fla. 2024) (finding the enforcement of an *ex parte* order violated public policy because it would have violated personal jurisdiction and that "assets of U.S. citizens and companies may not be frozen prior to judgment pending the adjudication of a claim for money damages."); *In re Gold & Honey, Ltd.*, 410 B.R. 357, 371-72 (Bankr. E.D.N.Y. 2009) (denying recognition on the basis that recognition of the foreign proceeding would reward and legitimize a violation of the automatic stay and a prior court order).

filing a petition for recognition, (ii) accompanying the petition with a court-stamped copy of the Judgment, which demonstrates the commencement of the Luxembourg Proceeding, and the Board Resolutions, which demonstrate the appointment of the Foreign Representative, and (iii) the Foreign Representative has identified the Luxembourg Proceeding as the only "foreign proceeding" with respect to the Debtor.

Accordingly, the Foreign Representative has demonstrated that the (i) the Luxembourg Proceeding is a foreign main proceeding and (ii) the Court should recognize Foreign Representative as the Debtor's foreign representative.

## IV.  **CONCLUSION**

For the foregoing reasons, the Court **GRANTS** the Motion to recognize the Luxembourg Proceeding as a Foreign Main Proceeding with the relief provided in section 1521(a) of the Code.

**IT IS SO ORDERED.**

Dated:  March 25, 2026
New York, New York

*Martin Glenn*
MARTIN GLENN
Chief United States Bankruptcy Judge

44